**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| JAMES DAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:02-CV-830 PS |
| | ) | |
| MONACO COACH CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

James Dawson is a devout Christian who claims to have been harassed at work and ultimately fired for his religious beliefs.  He has sued his former employer, Monaco Coach Corporation, who is now moving for summary judgment.  [Doc. 107.]  For reasons that are not particularly clear, discovery in this case became unnecessarily contentious leading to several rounds of motions before Magistrate Judge Cherry.  As a result, also before the Court is Dawson's objection to Judge Cherry's Report and Recommendation to deny a motion for sanctions brought by Dawson.  [Doc. 146.]

Dawson asserts three claims under Title VII against Monaco: 1) discrimination; 2) retaliation; and 3) harassment.  Dawson also seeks punitive damages against Monaco.  Monaco has moved for summary judgment on all three claims and Dawson's demand for punitive damages.  For the reasons set forth below, Monaco's Motion for Summary Judgment is denied and Plaintiff's objections to Magistrate Cherry's Report and Recommendation are overruled.

*Monaco's Motion for Summary Judgment*

## FACTUAL BACKGROUND

Though some of them are disputed, we describe the facts, as we must, in a light most favorable to Dawson.  Dawson describes himself as a devout, reborn Christian who has "surrendered himself to the Lord."  Dawson worked at Monaco for approximately 18 months from August 2000 until February 2002.  Initially, Dawson worked at Monaco as a temporary employee through a temporary employment agency.  Not long after he began working at Monaco, Monaco bought his employment contract from the temporary employment agency and made Dawson a full-time Monaco employee.

Dawson assembled frames for cabinets in recreational vehicles.  Dawson worked in the mill room at Monaco with approximately 25 other employees.  Dawson's co-workers in the mill room included Ms. Nina Ottman, Mr. Ron Donovan, and Mr. Scott Thornton.  Ottman worked immediately next to Dawson.  Thornton, Ottman, and Donovan are friends and often ate lunch together at Monaco.  Neither Thornton nor Ottman nor Donovan is a supervisor at Monaco.  Mr. Vern Lambright supervised Dawson and other employees in the mill room.  Lambright had the authority to discipline, hire and fire employees.[1]  He also was responsible for "writing up" employees when they missed work.  Mr. Marty Stahl was Dawson's group leader and had authority to discipline employees.  Mr. John Mayger served as Monaco's Human Resources director during Dawson's employment.  Ms. Christie Alley also worked in Monaco's Human Resources department.

---

[1] During Dawson's employment at Monaco, Lambright underwent three separate brain surgeries and was unable to work for significant periods of time.

2

Approximately two years before he started working at Monaco, Dawson "surrendered himself to the Lord."  He considers himself a "Christian of the Lord, a disciple."  Dawson practices his faith by attending church services on Sunday, by praying daily, by reading and studying the Bible, and by listening to Christian radio stations and audio tapes.  Dawson's religion is important to him and he is "active" and "outgoing" concerning his religion.  Profanity offends Dawson and his Christian beliefs.

The use of profanity was common in Monaco's mill room while Dawson worked there. Ottman, Donovan, Thornton, and other mill room employees used profanity.  The bathroom walls at Monaco contained profanity.  After Dawson began playing his Christian tapes at work, his co-workers began calling him names (many of which were profane) and making offensive comments toward him.  For instance, co-workers from time to time called Dawson a "fucking dickhead," "prickface," "stupid asshole," "shithead," "queer bait," and "son of a bitch."  Co-workers repeatedly referred to Dawson as "preacher man" or, in certain instances, "goddamn preacher man."  Co-worker Ottman once told Dawson that she wished he would get his "fucking Christian ass" out of the building because she hated him.  In addition, Ottman told Dawson to "go fuck himself" and she once called Dawson a "Jesus freak."

Co-worker Donovan also made derogatory statements to Dawson.  Dawson had to walk by Donovan's work station en route to the bathroom.  For example, Donovan once told Dawson "you need to leave you fucking Christian and get out of here" and "we don't need your kind around here."  Donovan also asked Dawson:  "Hey goddamn preacher man, how's it going? Why don't you leave?"  On several consecutive mornings, when Dawson said "good morning" to Donovan, Donovan responded: "fuck you!"

Dawson also was the target of multiple pranks at Monaco. Someone once greased Dawson's glue gun and taped his screw gun to his worktable. Someone once "unplugged the air" from Dawson's worktable and put grey tape on his hammer. Dawson also had trouble finding his timecard on occasion because someone had moved it from its usual location. In addition, someone defaced Dawson's timecard on one occasion by drawing horns on Dawson's picture, drawing a phallic symbol pointing toward Dawson's face, and writing "dickhead" on the timecard. Dawson assumes that Donovan defaced his timecard because the incident occurred shortly after Donovan cursed at Dawson one day.[2] Dawson reported the timecard incident to Stahl. Stahl said he would take care of it and removed the drawings from Dawson's timecard. After Dawson reported the timecard incident to Stahl, Donovan called Dawson more names.

In addition to language, Dawson also observed offensive drawings and markings in the mill room. On two occasions, someone drew a five-point star and the numbers "666" on Dawson's worktable. On another occasion, someone drew a burning cross on his worktable. The first time the five-point star and "666" appeared, Dawson complained to group leader Stahl. Stahl removed the drawings from Dawson's worktable. The second time they appeared, Dawson complained to supervisor Lambright. Lambright told Dawson: "That's just factory. When you work in the factory, you'll have those things." When the burning cross appeared, Dawson again complained to Lambright. Lambright responded: "That's factory. You'll have those things."[3]

---

[2]In reciting the facts, the Court uses the phrase "one day" periodically because Dawson has not presented evidence of when certain events occurred during his employment at Monaco.

[3]Monaco disputes Dawson's version of these events. Monaco acknowledges that Dawson made some complaints in early 2002 regarding "666" and "KKK" writings in the mill room. Human Resources Director Mayger testified that he and supervisor Lambright promptly went through the mill room to investigate Dawson's complaints, but did not find any drawings.

Co-worker Thornton had "666" and "KKK" written on the side of his machine for approximately three months.  Dawson walked by these markings on his way to the bathroom.  Dawson complained to group leader Stahl about the markings on Thornton's machine.  Stahl told Lambright about the markings and Lambright, in turn, investigated the situation.  Lambright approached Dawson and asked him where the markings were located.  Dawson directed Lambright to the markings, but the markings had been blacked out.  Lambright later instructed Dawson to use a different bathroom so Dawson could avoid or at least limit his contact with Thornton.

Dawson kept religious pictures and sayings at his worktable.  For example, Dawson wrote the following saying on his worktable:  "one cross and three nails equals forgiven."  Someone crossed out the saying on Dawson's worktable while Dawson was in the bathroom.  Dawson also kept family pictures at his worktable for a short period of time.  However, Dawson removed them after co-workers drew on them.  Dawson also kept a framed picture of Jesus at his workstation.  In December of 2001, Lambright told Dawson that he needed to remove the picture of Jesus because "it was offensive to someone."  The same day, Lambright and Stahl spoke to Dawson about his religion.  They told Dawson to remove all of his religious pictures and sayings from his work area.  Dawson did so at the end of the day.  Lambright noted contemporaneously that he "had everybody on the framing tables take [their] things out of the department."  [Doc. 127, Ex. L.]

---

Monaco disputes whether anyone made any offensive markings on Dawson's workstation. Monaco contends that there is no record of Dawson complaining about markings on *his* worktable and that no one (other than Dawson) recalls seeing the markings on Dawson's worktable or Dawson complaining about them.  (Stahl Dep. at 24; Ottman Dep. at 41; Thornton Dep. at 19.)

When Dawson started at Monaco, the company allowed mill room employees to listen to the radio at work.  Indeed, several workers in the mill room had radios at their workstations. Once he became a full-time Monaco employee, Dawson brought a radio to work so that he could listen to a local Christian radio station and certain Christian audio tapes.  Dawson did not listen to his radio and tapes during work time.  Rather, he listened to them during breaks, at lunch, and before work.  During lunch one day, co-worker Donovan heard Dawson's radio playing in the mill room.  Donovan described it as "preaching" or someone reading from the Bible.  Donovan approached Dawson, told him to turn down his radio, and called him a "stupid fucking idiot." On a different occasion, when Dawson was listening to his Christian audio tapes, Donovan told Dawson:  "Turn that fucking radio off.  We don't want to listen to your goddamn tapes." Donovan then threw staples at Dawson.

Supervisor Lambright talked to Dawson about the volume of his radio on three occasions. Lambright told Dawson that Dawson would be fired if he did not turn his radio down.  Dawson tried to keep the volume on his radio low.  Whenever a supervisor told him to lower the volume of his radio, Dawson complied and then marked the new volume level on his radio so that he would remember where it was.  Dawson's supervisors asked him to lower the volume on his radio several times.  The volume became so low that Dawson could not hear the radio or his tapes.  Dawson tried to use headphones, but they gave him an ear infection.

Ultimately, Dawson was told not to listen to his radio at work, yet other employees (at least for some period of time) were still allowed to listen to their radios.  Supervisor Lambright ultimately told all mill room employees that they could no longer have radios at work. According to Lambright, "if one person can't have it, nobody can have it."  After Dawson's

6

termination, Monaco reverted to its previous policy and let employees in the mill room listen to their radios.

Dawson complained about his work environment to multiple individuals at Monaco.  He complained to group leader Stahl two or three times.  He also complained to supervisor Lambright four or five times.  According to Dawson, Lambright responded:  "That's just trailer trash.  All people talk like that in trailer factories."  Lambright testified that it was not his duty to notify Human Resources if someone complains about religious harassment.  Lambright also testified that he did not think Mr. Dawson's complaints were "that serious."  Dawson also complained directly to Monaco's Human Resources department in February 2002.  On February 4, 2002, John Mayger, Monaco's Human Resources director at the time, wrote the following:

> Toured work area of Jim Dawson with Vern Lambright concerning James Dawson comments concerning KKK & 666 being visible on the saw operated by Scott.  Nothing was found on the saw, or through the department.
>
> James is a reborn Christian who has tried to pass on his religious beliefs to others in the dept. or anyone who will listen to him.  It has been received very unfavorably by his fellow employees to the point where it is causing friction in the department.  Jim has asked to be transferred, but Vern is reluctant to pass a problem on to another dept.  An attempt will be made to transfer, but if friction continues, it will be dealt with.

[Doc. 127, Ex. N.]

In February 2002, Dawson missed four days of work.  He never clocked in on the 14th, 19th, 26th, and 27th days of the month.  Monaco did not excuse these absences.  On February 14, Dawson was ill.  When he returned to work, Dawson presented Monaco with a doctor's note

indicating that he had a doctor's appointment on February 15.[4]  On February 15,  Lambright gave

Dawson a verbal warning.  [Doc. 126, Ex. V.]  Dawson offers no explanation for his absence on

February 19.[5]  On February 20, 2002, Lambright gave Dawson a first written warning, noting

that Dawson is "missing to [sic] many days and not calling into to supervisor."  On February 26,

2002, Dawson missed work because his truck spun into a ditch on the way to Monaco.  On

February 27, 2002, Dawson missed work because he could not get his truck out of the driveway.

Dawson claims he called into work each of the four days that he missed work in February.[6]

When Dawson returned to work on February 28, 2002, Monaco handled Dawson's

attendance violations in an odd way.  First, Lambright gave Dawson a second written warning.

[Doc. 127, Ex. W.]  In the write-up, Lambright stated:  "This is the third offense within the same

3 months."  The write-up contained a "last chance agreement" whereby Dawson was given 30

days to shape up or ship out.  *Id.*  It was not much of a last chance.  Later that day Dawson was

fired for excessive absenteeism.  [Doc. 127, Ex. P.]  It is unclear why Monaco put Dawson on a

---

[4] In his Statement of Genuine Issues of Material Fact, Dawson contends that "[a]n employee at [Monaco] will be granted a leave of absence because of an illness.  An employee may be placed on medical leave when that employee has a doctor's note."  [Doc. 126, ¶ 89.]  As support for this statement, Dawson cites to Exhibit S, which is "page 6" of an unidentified document that appears to be a Monaco employee manual.  [Doc. 126, Ex. S.]  The Court finds no support for the above statement in Exhibit S.  Exhibit T, however, is a one-page document titled "Attendance and Punctuality" and states in part:  "If you are absent two days or more due to illness or injury, a release from the doctor authorizing your return to work must be presented to your supervisor."  [Doc. 127, Ex. T.]  Despite this evidence, it is still not clear to the Court whether an absence supported by a doctor's note is deemed an excused absence.

[5] Dawson indicates that he was ill on February 14 and 15, 2002, but says nothing about why he missed work on February 19, 2002.  [Doc. 126, ¶ 92.]

[6] In the February 15, 2002 write-up, Lambright noted that it is Dawson's responsibility, if he is going to be absent from work, to let his immediate supervisor know before the workday begins.  [Doc. 127, Ex. V.]

thirty-day last chance agreement yet fired him later that same day.  In any event, later that day, Lambright made an internal notation that "you might want to get with supervision before rehire on James Dawson."  [Doc. 126, Ex. R.]

In late 2003, more than a year after Monaco terminated Dawson, co-worker Donovan missed approximately thirty days of work at Monaco while he served a jail sentence for a probation violation.  Monaco did not terminate Donovan and let him return to work upon his release.  According to supervisor Lambright, Donovan requested and received a leave of absence before he began serving his sentence and thus his was an excused absence.

Monaco's handling of Ronald DeKerr's absenteeism presents a more questionable case. Like Dawson, Ronald DeKerr was a production worker at Monaco, and he worked at Monaco during Dawson's employment there.  In early 2000, DeKerr missed four days work in a three-month period of time.  Instead of terminating DeKerr as he did with Dawson, Lambright merely gave DeKerr a thirty-day verbal warning.  [Doc. 127, Ex. X.]  Moreover, DeKerr was a bit of a serial violator of the attendance policy because he was written up again for attendance violations in October 2000 and November 2002.  *Id.*  Monaco did not fire DeKerr for any of these attendance violations.

## **DISCUSSION**

Dawson's amended complaint has three counts all emanating from Title VII:  religious harassment (Count I); retaliation (Count II); and discrimination based on religion relating to his termination (Count III).  Presently before the Court is Monaco's Motion for Summary Judgment. Monaco requests summary judgment on all three claims and in the alternative for summary judgment on Dawson's claim for punitive damages.

9

Summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The initial burden rests with the party seeking summary judgment to demonstrate an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 433 (7th Cir. 1994). The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999).

**A.      Discrimination Claim**

Title VII makes it  unlawful for "an employer . . . to discharge any individual . . . because of such individual's . . . religion. . ." 42 U.S.C. § 2000e-2(a). To establish a claim of religious discrimination, a plaintiff can proceed through the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 646 (7th Cir. 2005). The plaintiff has the burden to demonstrate that a genuine issue of material fact exists for trial. *Markel v. Bd. of Regents of the Univ. of Wisc. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002). But a plaintiff can avoid summary judgment "by creating a triable issue of whether the adverse employment action of which she complains had a

discriminatory motivation." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 721 (7th Cir. 2005).

To prevail using the indirect *McDonnell Douglas* method, Dawson must first establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees. *Whittaker*, 424 F.3d at 647 (sex discrimination case), citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir.2002); *see McDonnell Douglas*, 411 U.S. at 802. If Dawson fails to satisfy a single element of his *prima facie* claim, his discrimination claim cannot survive summary judgment. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). However, if Dawson can establish a *prima facie* claim, an inference of discrimination arises and the burden shifts to Monaco to articulate a legitimate, non-discriminatory reason for firing Dawson. *See McDonnell Douglas*, 411 U.S. at 802-03. If Monaco is able to produce a legitimate explanation, the inference of discrimination evaporates and the burden shifts back to Dawson to prove that the proffered justification is a pretext for discrimination. *See id.*

Monaco does not challenge, for purposes of summary judgment, the first and third elements of the *prima facie* case (i.e. that Dawson is a member of a protected class and that Dawson suffered an adverse employment action). However, Monaco contends that Dawson cannot satisfy the second and fourth elements (namely, that Dawson was meeting Monaco's legitimate performance expectations at the time he was terminated and that he was treated less favorably than any similarly situated employee).

Looking at the second element alone, Dawson presents little, if any, evidence to show that he was in compliance with Monaco's attendance policy at the time he was terminated. However, "where the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it 'makes little sense ... to discuss whether she was meeting her employer's reasonable expectations.'"  *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001) (quoting *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir.1999)).  In other words, if a plaintiff "produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a *prima facie* case by establishing that similarly situated employees were treated more favorably."  *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002); *see also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329-30 (7th Cir. 2002).

To satisfy the "merged" element, Dawson must show that he was treated less favorably than a similarly-situated employee.  *Grayson*, 308 F.3d at 818.  A similarly-situated employee is "someone who is directly comparable to [Dawson] in all material aspects."  *Herron v. DaimlerChrysler, Co.*, 388 F.3d 293, 300 (7th Cir. 2004) (citing *Grayson*, 308 F.3d at 819) (internal quotation marks omitted).  A district court should look at all relevant factors, the number of which depends on the context of the case.  *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).  Dawson must demonstrate that the employee was similarly situated with respect to performance, qualifications, and conduct.  *Id.*  This "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such . . . mitigating circumstances as would distinguish . . . the employer's treatment of them."  *Id.* at 617-18.

12

Dawson argues that he was treated less favorably than Ronald DeKerr.  Like Dawson, DeKerr was a production worker at Monaco.  They both worked at Monaco during the same time period, and they also reported to the same supervisor.  DeKerr was written up for missing four days of work in a three-month period.  Dawson points to a Monaco "Corrective Action Form," written in March of 2000, which states:  "Ron has missed 4 days in 3 month[s] & this is not exceptable [sic].  I'm putting Ron on verbal warning for 30 days from 3/21/00."  [Doc. 127, Ex. X.]  After this write-up, Monaco again wrote up DeKerr for attendance violations in October 2000 and November 2002.  *Id.*

Monaco urges that DeKerr did not, in fact, have four unexcused absences in a three-month time period, despite the fact their own documents say just that.  Its Human Resources manager, Ms. Alley, claims that DeKerr had only three unexcused absences in the first three months of 2000:  January 17, January 18, and March 20.  [Doc. 130, Ex. L.]  Ms. Alley states that the "fourth 'missed day' was February 24, when Mr. DeKerr clocked out early."  *Id.*  Exhibit 2 to Alley's affidavit contains DeKerr's attendance calendar for 2000 and a handwritten log that provides information about the days that Mr. DeKerr missed work.  *Id.*  The attendance calendar indicates that DeKerr was absent on February 24, 2000.  *Id.*  The accompanying log indicates that on that date he "went home sick - 8:00." *Id.* [7]  Thus, Monaco suggests that DeKerr showed up for at least part of the day on February 24, 2000.  Therefore, the argument goes, Lambright's March 2000 write-up is incorrect and DeKerr did not miss four full days in a three-month period.

---

[7] Immediately before the "went home sick - 8:00" notation is another notation that is crossed out.  The crossed-out notation appears to indicate "called in sick."  [Doc. 130, Ex. L.]

Monaco may well be correct that DeKerr and Dawson were not similarly situated with one another.  However, in a summary judgment posture, the benefit of the doubt goes to Dawson, and he has presented sufficient evidence to create a factual issue as to whether he and DeKerr were similarly situated and whether Monaco treated Dawson less favorably.  They were written up by the same supervisor and Human Resources personnel for missing four days of work in a three month period.  Dawson was fired for this reason.  DeKerr was not.  While Monaco presents evidence that the supervisor may have been mistaken when he wrote DeKerr up for missing four days in a three month period, this is a factual issue for a jury to decide.[8]

Because Dawson has established a *prima facie* claim of discrimination, the burden shifts to Monaco to advance a legitimate and nondiscriminatory reason for terminating Dawson.  The Court acknowledges that Monaco has done so, namely Dawson's unsatisfactory attendance.  Thus, under the *McDonell Douglas* method, the burden shifts back to Dawson to present sufficient evidence to create a triable issue as to whether this justification is a pretext.

To establish pretext, Dawson once again can use a direct or indirect method.  *Rizzo v. Sheahan*, 266 F.3d 705, 715 (7th Cir. 2001).  To prove pretext, Dawson must show that Monaco's reasons are (1) factually baseless; (2) not the actual motivation for the discipline; or (3) insufficient to motivate the adverse employment action.  *See Davis v. Con-Way Transp. Cent.*

---

[8] In addition, although Dawson argues that there are other employees besides DeKerr outside of the protected class – i.e. devout Christians – who were not fired for violating the attendance policy, we do not address them here because Dawson only needs to point to one such person and he has done so with DeKerr.  *See Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 342 (7th Cir. 2001).

*Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004); *Valasco v. Illinois Dept. of Human Serv.*, 246

F.3d 1010, 1017 (7th Cir. 2001).

Dawson has presented sufficient evidence of pretext to preclude summary judgment.  The

same evidence that satisfied the similarly-situated element also creates a triable issue of pretext.

Based on the evidence regarding Ron DeKerr, a reasonable jury could conclude that Monaco's

proffered reason for terminating Dawson was pretextual.  *See Curry*, 270 F.3d at 479 (same

evidence used to establish similarly-situated element also created factual issue as to whether

defendant's proffered reason for terminating plaintiff was a pretext); *Gordon v. United Airlines,*

*Inc.*, 246 F.3d 878, 892 (7th Cir. 2001)("A showing that similarly situated employees belonging

to a different racial group received more favorable treatment can also serve as evidence that the

employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a

pretext for racial discrimination.") (citations and quotations omitted)); *Russell*, 243 F.3d at 342

(female employee presented genuine issue of material fact as to whether employer's

nondiscriminatory reason for suspending her – that she falsified her time sheet – was pretextual,

where employee pointed to similar time sheet error incidents involving male employees and

employer took no disciplinary action against male employees).

 Monaco's motion for summary judgment on Dawson's discrimination claim is therefore

denied.

### B.      Retaliation Claim

Title VII prohibits employers from retaliating against employees for complaining about

discrimination or other unlawful practices.  42 U.S.C. § 2000e-3(a).  Under the indirect method

of proof, a plaintiff may withstand summary by demonstrating that (1) he engaged in statutorily

protected activity, (2) he was performing his job according to Monaco's legitimate expectations, (3) despite meeting those expectations, he suffered a materially adverse action, and (4) he was treated worse than a similarly situated employee who did not engage in statutorily protected activity. *Firestine v. Parkview Health System, Inc.*, 388 F.3d 229, 233 (7th Cir. 2004)(religion).[9] If a *prima facie* case is established, the burden then shifts to the defendant to provide a legitimate, non-invidious reason for the adverse employment action. *Rhodes v. Ill. Dep't. of Transp.*, 359 F.3d 498, 508 (7th Cir.2004); *Hilt-Dyson*, 282 F.3d at 465. If the defendant can provide a legitimate reason, the burden shifts back to the plaintiff to show that the proffered reason is a pretext. *Hilt-Dyson*, 282 F.3d at 465.

Like Dawson's discrimination claim, Monaco does not dispute for summary judgment purposes that Dawson engaged in protected activity or that Dawson suffered an adverse employment action. [Doc. 130-1 at 7-8.] Monaco again argues that Dawson's retaliation claim must fail because he was not performing his job satisfactorily at the time he was fired and he "can point to no evidence showing similar workers who had four unexcused absences in a three-month period but did not lose their jobs." [*Id.* at 8.]

---

[9] In interpreting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002), Monaco urges that Dawson must also prove a causal link between the protected activity and the adverse employment action to state a *prima facie* claim of retaliation under the indirect method. As reasonable as this position may sound, the Seventh Circuit has expressly rejected it. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 n.3 (7th Cir. 2004) ("Quad/Graphics [defendant-employer] incorrectly asserts that Buie [plaintiff-employee] must also prove a causal link between the protected activity and the adverse employment action. Although circuit precedent formerly required a causal link, *Stone*, which was decided under Circuit Rule 40(e), eliminated that requirement from the prima facie case of retaliation under the indirect method.")(citations omitted)).

16

The Court disagrees.  The analysis of Dawson's retaliation claim tracks the analysis of his discrimination claim.  Dawson has presented evidence that another production worker at Monaco who did not engage in the same protected activity as Dawson, was treated more favorably than Dawson.  DeKerr, like Dawson, was written up for missing four days in a three-month period.  Monaco terminated Dawson, but not DeKerr.

Taking the entire record into account, the Court finds that Dawson has produced sufficient evidence to survive judgment on his retaliation claim using the indirect method. Specifically, the Court finds that there are questions of material fact concerning whether:  (1) Dawson and DeKerr were similarly-situated; (2) whether Dawson was treated worse than DeKerr or other similarly situated employees who did not complain to Monaco about religious harassment; and (3) whether Monaco retaliated against Dawson for complaining about religious harassment.

## C.    Harassment Claim

Next we turn to Dawson's harassment claim.  Title VII prohibits an employer from maintaining a workplace permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Shanoff v. Illinois Dept. of Human Services*, 258 F.3d 696, 704 (7th Cir. 2001), citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  To survive summary judgment, Dawson must show:  (1) he was subject to unwelcome harassment; (2) the harassment was based on his religion; (3) the harassment was severe or pervasive so as to alter the conditions of his work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability.  *See Williams v. Waste Management of Illinois*, 361 F.3d 1021,

1029 (7th Cir. 2004) (citations omitted) (setting forth elements of hostile work environment claim based on race).  Further, Dawson must show that the work environment was both subjectively and objectively hostile.  *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). "The standard set out in *Harris* was intended to take a middle path between making actionable any merely offensive conduct and requiring tangible psychological injury before the conduct is actionable."  *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998).

In determining whether a work environment is hostile or abusive, courts must consider all of the circumstances, including the frequency of the alleged conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  *Harris*, 510 U.S. at 23.  No single factor is required to sustain a hostile work environment claim nor is there any "magic number" of incidents that give rise to a cause of action.  *Shanoff*, 258 F.3d at 704, *citing Doe*, 42 F.3d at 445. Relatively isolated instances of nonsevere misconduct will not support a claim of a hostile environment.  *Ngeunjuntr*, 146 F.3d at 467.  To support his claim, Dawson may point to facially discriminatory remarks, as well as any other remarks or behavior that may reasonably be construed as being motivated by hostility to Dawson's religion.  *Shanoff*, 258 F.3d at 704. However, the complained-of conduct must have a religious character or purpose to support a Title VII claim.  *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) (case involving sex and race discrimination).

Monaco argues it is entitled to summary judgment because Dawson lacks sufficient evidence to show: 1) the alleged conduct was severe or pervasive; 2) the alleged conduct was based on or "because of" Dawson's religion; and 3) there is no basis for employer liability.  If

Dawson fails to create a triable issue as to any of these elements, Monaco is entitled to summary judgment.

    1.   Severe or Pervasive

   For harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Conduct that is *either* severe *or* pervasive may give rise to a hostile work environment. *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 951 (7th Cir. 2005)(emphasis in original). "Pervasiveness and severity are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Id.* Title VII is not designed "to purge the workplace of vulgarity." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). Nor is it a "general civility code." *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). Many employees "have to put up with some amount of rude, arrogant, or boorish behavior at work." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F. 3d 334, 339 (7th Cir. 2002).[10]

---

  [10] Monaco asserts that the complained-of conduct must "cause such anxiety and debilitation to the plaintiff that working conditions were poisoned." [Doc. 108 at 12-13.] To support this proposition, Monaco cites to *Shapiro v. Holiday Inns, Inc.*, 1990 U.S. Dist. LEXIS 3801 (N.D. Ill. April 5, 1990), which quotes *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 213 (7th Cir. 1986). The standard set forth in *Shapiro* and *Scott*, however, is no longer an accurate statement of the law in this Circuit. *See Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) ("Thus, to the extent that our prior cases required proof that the harassment 'caused such anxiety and debilitation to the plaintiff that working conditions were poisoned,' *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 213 (7th Cir. 1986), they have been overruled. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it to be psychologically injurious.").

Viewing the evidence, as we must, in a light most favorable to Dawson, the Court finds that Dawson has presented sufficient evidence to create a triable issue of whether the alleged conduct at Monaco was severe or pervasive.  While none of the incidents by themselves is sufficiently severe to satisfy this element, Dawson presents evidence of a pattern of harassing conduct when, taken as a whole and viewed most favorably to Dawson, could reasonably be deemed severe or pervasive.  For example, Dawson presents evidence that one co-worker told him she wished he would get his "fucking Christian ass" out of the building because she hated him, and another co-worker said to him "you need to leave you fucking Christian and get out of here" and "we don't need your kind around here."  Dawson further presents evidence that his co-workers called him a litany of names (many of which were profane) on a regular basis.  In addition, Dawson presents evidence that his co-workers tampered with his work tools on multiple occasions, defaced his timecard and made it difficult to find, made offensive drawings on his workstation and elsewhere in the mill room, defaced personal sayings and pictures at his workstation, and threw staples at him.  While the Court does not necessarily view Dawson's harassment claim as strong, the Court cannot say that no reasonable jury could ever find the complained-of conduct to be either severe or pervasive.

In challenging this element, Monaco argues that the "only explicitly religious conduct [identified by Dawson] was use of the name 'preacher man' and, on one occasion, 'fucking Christian.'"  [Doc. 108 at 13.]  Monaco's summary of the "explicitly religious" conduct is incomplete.[11]  But even if it were complete,  Dawson may rely on more than "explicitly

_____

[11] Dawson presented evidence that at least two co-workers called him a "fucking Christian" in making it known to Dawson that they wanted him to leave Monaco.  Monaco also ignores the "Jesus freak" comment made by Ottman.

religious" conduct to survive summary judgment.  *See Shanoff*, 258 F.3d at 704 ("In order to support his Title VII claim, [plaintiff] may point to [supervisor's] facially discriminatory remarks, as well as any of her remarks and behavior that may reasonably be construed as being motivated by her hostility to [plaintiff's] race or religion.").  Even *Rivera v. Puerto Rico Aqueduct & Sewers Auth.*, 331 F.3d 183 (1ˢᵗ Cir. 2003), a cased cited by Monaco, acknowledges that "[o]f course, conduct need not be explicitly religious to constitute harassment because of religion."  *Rivera*, 331 F.3d at 190 n.2.  Dawson has presented sufficient evidence to create a factual issue of whether the alleged harassment was either severe or pervasive.[12]

2.  Based on or "Because of" His Religion

Monaco argues that it is entitled to summary judgment on Dawson's harassment claim because Dawson has presented no evidence that he was singled out "because of" his religion.  The Court disagrees.  Dawson has presented sufficient evidence such that a reasonable jury could find that he was subjected to the complained-of conduct because of his religion.  Dawson's religion was no secret at Monaco.  In addition, several of the hostile incidents cited by Dawson are patently or arguably tied to his religion.  (*See, e.g.* Donovan told Dawson "you need to leave

---

[12] Monaco argues that *Rivera* and *Shapiro v. Holiday Inns, Inc.*, 1990 U.S. Dist. LEXIS 3801 (N.D. Ill. April 5, 1990) are instructive.  Both cases are distinguishable.  The plaintiff in *Rivera*, a Catholic woman asserting a religious discrimination claim, presented evidence that she was called "Mother Theresa" by co-workers, that a co-worker sang a bawdy Christmas carol to her, and that she received a birthday card depicting a pig wearing a rosary.  Viewing the evidence presented by Dawson in a light most favorable to him, Dawson's alleged harassment at Monaco was more severe and pervasive than Rivera's.  In *Shapiro*, the district court granted summary judgment to the defendant on a religious hostile work environment claim at least in part because the plaintiff admitted "she never complained of the [derogatory] comments" and "they had no effect on her and she thought them trivial."  1990 U.S. Dist. LEXIS at *26.  Here, Dawson has presented evidence that he complained about the conduct at Monaco and that he was upset about the way people were treating him at work.  [Doc. 126, ¶ 74.]

21

you fucking Christian and get out of here" and "we don't need your kind around here"; Ottman

told Dawson that she wished he would get his "fucking Christian ass" out of the building

because she hated him; Ottman called Dawson a "Jesus freak"; when Dawson was listening to

religious music at work, Donovan told him to turn "that fucking radio off," told him "we don't

want to listen to your goddamn tapes," and threw staples at him; individuals drew the numerals

"666" and a five-point star on Dawson's workstation and elsewhere in the mill room.)

Monaco argues that Dawson provoked Ottman's comments by calling her a "sinner" and

a "beast," and that Ottman's response to religious-tinged provocation cannot be religious

harassment.  [Doc. 108 at 15.]  While Monaco may be right, it is not enough to merit summary

judgment.  Dawson denies calling Ottman a sinner (Dawson Dep. at 444) and, under Rule 56, we

must view the evidence in a light most favorable to Dawson.  Moreover, even if Ottman's

response to "religious-tinged provocation" does not support a religious harassment claim, this

would only excuse Ottman's comment to Dawson that he "go fuck himself."  Monaco does not

advance the "religious-tinged provocation" to the remaining evidence that Dawson relies on to

support his harassment claim.  Again, viewing the evidence in a light most favorable to Dawson,

a reasonable jury could find that Dawson was subjected to a hostile work environment based on

or because of his religion.

> 3.      Basis for Employer Liability

As stated above, to survive summary judgment, Dawson must establish among other

elements that there is a basis for employer liability.  Monaco asserts that Dawson's hostile work

environment claim fails as a matter of law because Monaco responded promptly and reasonably

to Dawson's complaint.

Analysis of the element depends on whether the alleged harassment was perpetrated by supervisors or coworkers. *Williams*, 361 F.3d at 1029. In a supervisor-harassment situation, employers are vicariously liable under Title VII for the actions of a supervisor if the plaintiff suffered a tangible employment action. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998). If the plaintiff did not suffer a tangible employment action, the employer has an affirmative defense if it can show: (1) it exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Cerros*, 398 F.3d at 951-52, quoting *Ellerth*, 524 U.S. at 765.

On the other hand, in a co-worker harassment case like Dawson's, employers are liable for a coworker's harassment only when they have been negligent either in discovering or remedying the harassment. *Cerros*, 398 F.3d at 952. In other words, "the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Williams*, 361 F.3d at 1029. An employer satisfies its legal duty in coworker harassment cases "if it takes reasonable steps to discover and rectify acts of ... harassment of its employees." *Cerros*, 398 F.3d at 952, citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998).

Dawson argues that Monaco "has no affirmative defense in this matter because [supervisors] Lambright and Stahl's harassment culminated in Dawson's termination, which is considered a tangible employment action." [Doc. 125 at 9.] Even if the harassment did not

result in a tangible employment action, Dawson argues that a genuine factual issue exists as to whether Monaco acted negligently.

Because this is not a supervisor-harassment case, the Court need not address whether the harassment culminated in a tangible employment action that would preclude Monaco from asserting an *Ellerth/Faragher* defense.  If Dawson has a colorable harassment claim, it is based on the harassment by his co-workers.  As set forth above, Monaco is liable for coworkers' harassment only if it was negligent either in discovering or remedying the harassment.  *Cerros*, 398 F.3d at 952.   The employer has to have exercised reasonable care to prevent and promptly resolve harassment complaints, but the employer is not required to show that its efforts were successful.  *See Hardy v. Univ. of Illinois at Chicago*, 328 F.3d 361, 364-66 (7th Cir. 2003).

Once again, Dawson has presented sufficient evidence to create a genuine factual issue of whether Monaco was negligent in discovering or remedying the harassment.  While the record contains evidence that Monaco may not have acted negligently, Dawson presents enough evidence to survive summary judgment.  For example, Dawson testified that he complained to Stahl two or three times and to Lambright four or five times about the way he was being treated by co-workers.  Dawson testified that Lambright responded:   "It's just a trailer factory, Jim.  You'll have that problem."  (Dawson Dep. at 83.)   In addition, Lambright testified that it was not his duty to notify Human Resources if someone complains about religious harassment.  (Lambright Dep. at 90.)  He also testified that he did not think Dawson's complaints of religious harassment were "that serious."  *Id.*  Based on this evidence, a jury will have to decide whether Monaco acted negligently in discovering or remedying the harassment.

**D.      Punitive Damages**

Lastly, Monaco argues that even if Dawson withstands summary judgment on his Title VII claims, Monaco cannot be held liable for punitive damages as a matter of law.  A plaintiff may recover punitive damages under Title VII if the employer engaged in intentional discrimination and acted with malice or with reckless indifference to the federally protected rights.  42 U.S.C. § 2000e *et seq*.  While Dawson faces a steep hill to climb in meeting this standard, we believe that the better approach is to address this matter during trial at the jury instruction conference.  If the evidence at trial does not establish that Monaco acted with malice or reckless indifference to Dawson's rights, then the jury will not be instructed on punitive damages, and Dawson will have no right to them. Of course, the converse is also true.  For now, Monaco's motion for summary judgment is denied as to punitive damages.

*Dawson's Objection to Magistrate Judge Cherry's Report and Recommendation*

## BACKGROUND

On April 13, 2005, Dawson filed an Amended Motion for Default and Other Sanctions. [Doc. 87]  Dawson alleged that Monaco:  1) violated Magistrate Judge Neuchterlein's September 12, 2003 Order by asserting over 400 objections at three depositions; 2) violated Magistrate Judge Cherry's March 18, 2005 Order by making frivolous objections to Dawson's Request for Admissions; and 3) acted in bad faith when its expert asked Dawson certain questions during a mental examination.  As sanctions for this alleged conduct, Dawson asked the Court to strike Monaco's answer, to strike Monaco's expert report, to bar Monaco's expert from testifying, and to enter a default judgement against Monaco.

On May 4, 2005, this Court referred Dawson's motion to Magistrate Judge Cherry for a report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B)&(C).  On June 10, 2005, Judge Cherry held a hearing on Dawson's motion.  On October 3, 2005, Judge Cherry released a Report and Recommendation that Dawson's motion be denied because, among other reasons, the deposition conduct was not sanctionable, Dawson suffered no prejudice, and Dawson did not seek to resolve the dispute informally in accordance with local rules.  On October 12, 2005, Dawson filed an objection to Judge Cherry's Report and Recommendation.  On October 25, 2005, Monaco responded to Dawson's objections.

## DISCUSSION

When a party objects to a magistrate's report and recommendation, the district court "shall make a *de novo* determination of those portions of the report . . . or recommendations to which objection is made."  28 U.S.C. §636(b)(1)(C).  The district court "may accept, reject, or

modify, in whole or in part, the findings or recommendations made by the magistrate judge."
*Id.*; Fed. R. Civ. P. 72(b).

Judge Cherry's Report and Recommendation accurately summarizes the law regarding
the imposition of sanctions under Rule 37.  Therefore, the Court will not regurgitate the
standards here.  Dawson objects to Judge Cherry's Report and Recommendation on several
grounds.  Dawson contends that:  1) the failure to sanction Monaco will encourage Monaco to
repeat the alleged conduct in the future; 2) prejudice to Dawson is not a prerequisite for the
imposition of sanctions; 3) Dawson complied with Local Rule 37.1 by designating deposition
transcripts that reflect argument between counsel about certain objections; 4) defense counsel
was well aware of Judge Neuchterlein's September 12, 2003 Order because it had been marked
as an exhibit at a January 2005 deposition and defense counsel also referred to it immediately
before Dawson's deposition in November 2004; 5) Monaco's expert "forever prejudiced"
Dawson's case by asking him certain questions during his medical examination; and 6) the fact
that Monaco's expert is not a lawyer does not preclude a finding that she violated the attorney-
client privilege.

The Court addresses Dawson's objections in order.  First, the Court disagrees that the
failure to impose sanctions will invite Monaco to "engage in similar conduct" in the future.  The
Court believes that both parties will adhere to all applicable orders and rules for the duration of
this dispute, and that sanctions, at this juncture, are not warranted.  Second, while Dawson points
out that prejudice is not required to impose sanctions, it is certainly a proper factor for a court to
consider in assessing whether sanctions are warranted.  *See Mid-America Tablewares, Inc. v.
Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996) (holding that a party's inability to

articulate the basis of its prejudice supported the district court's decision to deny the party's

motion for Rule 37 sanctions).  Third, Dawson did not comply with Local Rule 37.1, which

requires that a certification "be made in a separate document filed contemporaneously with the

motion."  L.R. 37.1(c).  Attaching a deposition transcript with back-and-forth between counsel is

not even close to being enough to meet this standard.  Fourth, Dawson has provided neither

proof that Judge Neuchterlein's Order was marked as a deposition exhibit nor evidence of the

conversation with defense counsel immediately before Dawson's deposition.  Nevertheless, even

if both events occurred as Dawson describes, they still do not warrant the imposition of sanctions

at this juncture.  Fifth, Dawson has not articulated how his case has been "forever prejudiced" by

the information elicited by Monaco's expert, Dr. Goldstein, during her examination of Dawson.

Sixth, the Court agrees with Dawson that Dr. Goldstein's non-lawyer status does not

preclude an intrusion into the attorney client privilege.  Nor does the fact that the questioning

occurred outside of a deposition setting.  One need not be a lawyer to delve into someone else's

attorney-client privileged communications and such an intrusion has the same effect whether it

occurs on the street or at a deposition.  Nevertheless, based on the record before us, the Court

does not find that the questions posed by Dr. Goldstein to Dawson during her examination

warrant sanctions against Monaco.  Dawson has moved to exclude or limit the testimony of Dr.

Goldstein [Doc. 128], and the Court will address that motion in a separate order.  "If it is

determined that [Dr. Goldstein] questioned the plaintiff improperly, that evidence may be

excluded at trial."  *Wheat v. Biesecker*, 125 F.R.D. 479, 480 (N.D. Ind. 1989); *see also* Wright,

Miller & Marcus, Federal Practice and Procedure, Civil 2d § 2236 ("If there was some

impropriety in the conduct of the examination, this can be brought to the attention of the court, and it can exclude the resulting evidence").

## **CONCLUSION**

For the foregoing reasons, Monaco's Motion for Summary Judgment [Doc. 107] is **DENIED**, Dawson's objections to Judge Cherry's Report and Recommendation [Doc. 146] are **OVERRULED**, and Dawson's Motion To Strike Defendant's Supplemental Designation of Evidence [Doc. 131] is **DENIED** as moot**.**

**SO ORDERED.**

Entered:  November 9, 2005

 s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

29